**2015 BNH 004**          Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                    Bk. No. 13-10111-BAH
                                                          Chapter 7
Kevin D. Boulard,
                Debtor

Debra Piotrowski,
                Plaintiff

v.                                                        Adv. No. 13-1152-BAH

Kevin D. Boulard,
                Defendant

*Megan Douglass, Esq.*
*Backus, Meyer & Branch, LLP*
*Manchester, New Hampshire*
*Attorney for Plaintiff*

*Daniel R. Hartley, Esq.*
*Casassa and Ryan*
*Hampton, New Hampshire*
*Attorney for Defendant*

## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

Debra Piotrowski (the "Plaintiff" or "Piotrowski") worked as a dental hygienist in the

dental office of Kevin D. Boulard (the "Debtor" or the "Defendant").  The Plaintiff contends that

the Defendant wrongfully terminated her employment in May 2011, in violation of New

Hampshire's whistleblower statute, NH RSA (hereinafter "RSA") 275-E.  After the Defendant

filed for bankruptcy in 2013, the Plaintiff filed a complaint seeking to except from the Debtor's

discharge her claim for damages arising from her employment termination, pursuant to 11 U.S.C.

§ 523(a)(6).  The Court conducted a two-day trial in April 2015 and took the matter under advisement.  This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

Plaintiff worked as a dental hygienist in the Defendant's dental office, Northeast Family Dental Center, P.C. d/b/a New England Dental Visions, in Nashua, New Hampshire, from February 2009, to May 11, 2011.  The office was managed by Olga Beguiristain Boulard ("Beguiristain"), the Debtor's then girlfriend and now wife.  Piotrowski signed a letter on February 23, 2009, which outlined her compensation and general responsibilities.  Piotrowski was to work 32 hours per week at the rate of $38 per hour.  Piotrowski's pay was on the "high end" for dental hygienists, according to the Debtor.  Because of her experience, the Debtor expected her to be more productive than the average hygienist.   Piotrowski's production goal, i.e., the amount to be billed for Piotrowski's services, was $2,000 per day.[1]  She was to earn a quarterly bonus of ten percent of hygiene collections that exceeded that goal.  In addition to traditional hygienist duties, Piotrowski's responsibilities included making "continuing care phone calls" to patients in an attempt to "reactivate" them and to schedule them for appointments with the office.  Continuing care calls were a way to help fill any open time slots in Piotrowski's

---

[1]  There was some discussion at trial that Piotrowski's productivity requirement had been eliminated and her hours had been reduced to 28 hours per week based upon a letter dated April 6, 2009.  The origin of that letter was never satisfactorily explained at trial.  Piotrowski testified that she worked full time for the Debtor, working 30-32 hours per week.

schedule.[2]  Piotrowski also was required to assist in the office at the direction of the office manager in order to help with the Debtor's dental practice.

Once employed by the Debtor, Piotrowski received an employee handbook and policy manual.  The handbook explained that complaint and grievances could be brought to the office manager and that, in order to maintain a team atmosphere in the office, employees were required to maintain a "spirit of cooperation and helpfulness."  The handbook further explained that an employee "may be terminated at any time with appropriate notice, for any cause whatsoever, or no cause."  During the course of her employment, Piotrowski also received and signed a confidentiality agreement, which provided that she must keep confidential any "information concerning patients, the company, financial information or other related information."

Piotrowski liked working at the Debtor's office.  The office was small, with employees consisting of the Debtor, Beguiristain, Piotrowski, and a dental assistant.  Another dentist, Dr. Franklyn Liberatore, also practiced in the office.  At times, additional office workers or dental assistants worked there as well.

In the fall of 2010, Piotrowski first became concerned about the manner in which the dental practice operated.  In early October 2010, an insurance company denied a claim submitted by the office because no periodontal charting had been done on the patient, who had been seen in the office on September 28, 2010.  Piotrowski testified that in early October, after the denial of the claim, Beguiristain logged into the computer and edited the patient's medical record to include the periodontal charting, which Piotrowski contends was never completed during the visit.[3]  Beguiristain then re-submitted the claim to the insurance company, which paid the claim

---

[2]  The Debtor testified that it is easier to reactivate existing patients than it is to obtain new patients.

[3]  At trial, the Debtor testified that the periodontal charting had in fact been done as evidenced by another employee's notes in the patient's medical records for that date.  He stated there was no need for Beguiristain to fabricate the chart because the charting was completed.

in November 2010.  Piotrowski testified that Beguiristain bragged that she had just committed insurance fraud on the day Beguiristain backdated the medical record.  Piotrowski further testified that Beguiristain then threatened Piotrowski and two other employees (who also witnessed Beguiristain's alleged falsification of the patient's medical record) that they would be fired if they disclosed this information to the Debtor.  Piotrowski never reported the incident to the Debtor.  After this incident, Piotrowski began keeping her own personal notebook regarding the dental practice.

In December 2010, Piotrowski reportedly asked for a raise.  Piotrowski disputed this at trial, but the Debtor and Beguiristain both testified that a request was made.  According to the Debtor, he told Piotrowski that he could not give her a raise because he was already overpaying her for what she was producing.  He gave her some advice on how to increase her productivity, which included taking more x-rays and making continuing care calls in order to reactivate patients, many of whom the Debtor believed would likely need gum therapy, not having been seen in the office for some time.

The Debtor testified that Piotrowski's attitude changed after this discussion.  He indicated that she should have been making continuing care calls on a daily basis.  Instead, she did it less often and only for a few minutes at a time.  Piotrowski testified that she was uncomfortable calling patients at work and did not think it was appropriate.  Instead, she preferred to call them at home or on their cell phones.

On February 7, 2011, a new dental assistant, Cathy Dolan ("Dolan"), began working in the office.  While Piotrowski worked mostly independently, cleaning patients' teeth and taking x-rays, Dolan worked directly with the Debtor, helping him with instruments and other more complex dentistry tasks.

On February 16, 2011, there was another incident between Beguiristain and Piotrowski. Piotrowski contends that Beguiristain informed her on that date that Piotrowski would be required to administer local anesthesia at an appointment on Friday, February 18, 2011, a day on which the Debtor was not going to be present in the office. Piotrowski contends that she informed Beguiristain that she could not and would not provide such services because it is against New Hampshire's dental regulations to administer local anesthesia when a doctor is not present in the office.[4] Beguiristain purportedly told Piotrowski that if she did not do it, she would find a hygienist that would.

Beguiristain provided a different version of the event. She testified that she merely asked Piotrowski to call the New Hampshire Dental Board to inquire whether a dentist must be present for a hygienist to administer local anesthesia. Beguiristain testified that Piotrowski refused to make the telephone call and so Beguiristain made the call herself. When Beguiristain learned that a hygienist could not administer anesthesia without the dentist's presence, the patient's appointment was rescheduled.

A third incident occurred on March 3, 2011. The Debtor did not come into the office that day as he was experiencing back pain. A patient appeared at the office that day for a cleaning, and although she had an appointment card, she was not on the schedule for the day.[5] The testimony as to what transpired next conflicts. Beguiristain testified that when the patient arrived, Dolan indicated she could polish the child's teeth, as she had the qualifications to perform coronal polishing, and would have Piotrowski review the patient's chart and examine the patient's mouth before doing the polishing. Dolan testified that Beguiristain told her to

---

[4] N.H. Code Admin. R. Ann. Den. 302.05(r)(1)(a).

[5] At trial, the parties testified that the office was having difficulty with the software that they used to schedule appointments and process insurance claims. Because of these software issues, it was not unusual for a patient to arrive at the office for an appointment without the appointment being in the schedule for the day.

polish the child's teeth and apply a fluoride treatment. Dolan testified that Piotrowski did not examine the patient either before or after Dolan treated her. Piotrowski testified that she was already booked with a patient during the time when the patient was being seen and thus was unavailable to see the patient. She testified that she did not examine the child. It is undisputed that for that visit the Debtor's office billed the patient's insurance company for a child prophylaxis (CDT 1120)[6] and a periodic oral evaluation (CDT 0120).[7]

Piotrowski was concerned about what transpired that day for several reasons. First, a patient's teeth may only be polished if a dental assistant has taken an expanded duty course on coronal polishing,[8] which course Dolan purportedly had not taken. Second, New Hampshire's dental regulations require a dentist or hygienist to examine a patient's teeth to determine that the teeth are free of calculus before they may be polished, and no such examination of the patient took place.[9] Third, Piotrowski was concerned because New Hampshire's dental regulations provide that a "[c]oronal polishing shall in no way be represented as a prophylaxis unless a dentist or dental hygienist has determined the teeth are free of calculus immediately prior to the

---

[6] CDT stands for "Current Dental Terminology," which is the coding information developed by the American Dental Association. See Charles Blair, D.D.S., Coding with Confidence: The "Go To" Dental Insurance Guide (2010). This coding information is submitted to insurance companies when seeking payment on a claim.

[7] CDT 0120 (periodic oral evaluation – established patient) is specifically described as: "An evaluation performed on a patient of record to determine any changes in the patient's dental and medical health status since a previous comprehensive or periodic evaluation. This includes an oral cancer evaluation and periodontal screening where indicated, and may require interpretation of information acquired through additional diagnostic procedures. Report additional diagnostic procedures separately." American Dental Association, The ADA Practical Guide to Dental Procedure Codes 5 (2010) (the "CDT Handbook"). The introductory language in the CDT Handbook for all "clinical oral evaluations" explains in part: "The codes in this section recognize the cognitive skills necessary for patient evaluation. The collection and recording of some data and components of the dental examination may be delegated; however, the evaluation, which includes diagnosis and treatment planning, is the responsibility of the dentist." Id.

[8] N.H. Code Admin. R. Ann. Den. 302.05(o).

[9] N.H. Code Admin. R. Ann. Den. 302.05(p)(4).

polishing;"[10] here, the patient was charged for a prophylaxis and the charge had Piotrowski's name attached to it in the billing records.  Lastly, Piotrowski was upset because the patient was charged for a periodic evaluation.  Piotrowski contends that a dentist cannot bill for a periodic oral evaluation under CDT 0120 unless the dentist has physically examined the patient.

On March 7, 2011, the next business day after the unscheduled patient incident, Piotrowski noticed that the battery on the office's automated external defibrillator (AED) machine was purportedly expired.  Piotrowski testified that she informed Beguiristain about it, and Beguiristain said not to worry about it, that she would take care it.  The Debtor and Beguiristain both testified that Piotrowski never informed them that she believed the battery was expired.[11]

On March 8, 2011, Piotrowski approached the Debtor with her concerns about the treatment and billing of the unscheduled patient who appeared on March 3, 2011.  Piotrowski testified that the Debtor completely ignored her concerns.

On March 14, 2011, the Debtor was out of the office again.  Beguiristain was out as well.  Piotrowski and Dolan testified that they received several phone calls that day from patients who were questioning the charges on their bills.  Some of the patients were specifically wondering why they were billed for an examination when the Debtor never even came into the room during their appointment.

---

[10]  N.H. Code Admin. R. Ann. Den. 302.05(p)(6).

[11]  In fact, the battery had not expired at that time.  The battery had been manufactured in September 2007, and the AED was purchased in December 2007.  The battery was guaranteed to work four years from the date of installation. The battery began to beep in December 2011, months after Piotrowski was terminated.  A replacement battery was purportedly ordered at some point, but was backordered.  At the time the New Hampshire Dental Board subsequently conducted an unannounced inspection of the Debtor's dental practice on March 8, 2012, the AED was not operable.  Appeal of Boulard, 165 N.H. 300, 301 (2013).

On March 15, 2011, Piotrowski and Dolan went to the Debtor to discuss their concerns. They indicated that they were worried about the practice and concerned about their jobs, as patients were calling and complaining.  They raised an issue about the office's billing practices, specifically questioning Beguiristain's submission of claims for periodic evaluations (CDT 0120) to various insurance companies when the Debtor had been out of the office for the day and had not seen the patients.  In Piotrowski's view, it was inappropriate for the Debtor to bill for a periodic oral evaluation when he was not in the office.  The Debtor responded that Beguiristain knew what she was doing and they should just let Beguiristain do her job.  He testified that he told them he had researched the issue previously and agreed with Beguiristain that it was appropriate to bill using this particular code.  The Debtor testified that he found nothing in his research to indicate that a dentist must be in a patient's room when completing the evaluation. The Debtor assured them that their concerns were not valid.  According to the Debtor, during this same discussion, Dolan and Piotrowski accused Beguiristain of taking money from the practice and giving it to her former husband.  They insisted that Beguiristain did not know her job or what she was doing.

After the discussion, the Debtor purportedly researched the coding issue again and continued to believe that it was appropriate to bill using this code.  He testified that he never came across the materials presented by Piotrowski at trial, which indicated that a dentist must have had his "hands in [the patient's] mouth" to bill for a periodic oral evaluation (CDT 0120).[12] He believed that as long as the hygienist had gathered the information set forth in the code, e.g., performed an oral cancer screening and taken x-rays, then he could examine and evaluate that information; determine the appropriate treatment plan for the patient, and bill for his services.

---

[12]  Blair, supra note 6, at 10.

The next day, on March 16, 2011, Beguiristain spoke with Piotrowski and indicated she was upset with her and Dolan.  She told her that they should not have approached the Debtor about their issues.  Later that afternoon there was an incident involving a patient, who was also a friend of Piotrowski's husband.  The patient called the office, but no one picked up the telephone as Beguiristain purportedly told Piotrowski not to answer the phone.  Later that same evening, Beguiristain contacted Piotrowski at home and purportedly threatened to discharge her for discussing billing practices with the Debtor.  Beguiristain was upset that Piotrowski and Dolan were questioning the ethics of the practice.  Piotrowski was so upset by her conversation with Beguiristain that she scheduled an appointment the following day with her primary care physician, who prescribed her some medication to deal with her sleeplessness and "stress" from her job.  Piotrowski spoke to the Debtor again on March 17, 2011, to relay what had happened the day before, but the Debtor did not want to hear about it.

For the next month, it appears that things quieted down at the dental practice, at least with respect to Piotrowski.  Beguiristain scheduled a meeting, however, with Dolan for Friday, April 22, 2011.  Dolan testified that she thought the meeting was scheduled to discuss ordering and problems with lab cases.  Beguiristain testified that she intended to discuss with Dolan areas in which Dolan needed to improve her performance.  Dolan was not prepared to have a lengthy meeting with Beguiristain as she arrived at the meeting with her daughter and needed to retrieve her dog from the pet groomer.  Instead of covering the five areas that needed improvement per Beguiristain's written performance evaluation, they were able to cover only one:  Dolan's interactions with Beguiristain in her "role as the practice manager."  According to Beguiristain, during the course of the meeting, Dolan relayed "horrific" information to Beguiristain that she had heard from Piotrowski and others in the office.  Specifically, Piotrowski "told her that we charge for work that is not done (which is insurance fraud) and that we are lying about the

9

financial state of the practice."  Beguiristain informed Dolan that this was not true and that the spreading of false information would not be tolerated.

Within two days of this meeting, the Debtor apparently decided he was going to replace Piotrowski.  On Sunday, April 24, 2011, Beguiristain posted a job listing for a dental hygienist online.

On Monday, April 25, 2011, the dental office's contact at the local newspaper came into the office to conduct business and purportedly told Beguiristain that she had bumped into a former employee, who had informed her that the Debtor was going to let Dr. Liberatore go. Beguiristain and the Debtor knew this information could only have come through Piotrowski (who learned the information at lunch one day) as they had not discussed it with anyone else. The Debtor was upset that Piotrowski was discussing private practice information with a former employee (Diane Hildreth), which was contrary to the confidentiality agreement Piotrowski signed.  The Debtor indicated that this incident only reinforced his decision that they were doing the right thing by letting Piotrowski go.

The final incident involving Piotrowski occurred on April 27, 2011.  The computers were not working in the office that day, as they were conducting a reboot of the software used to run the office.  Accordingly, no one in the office was able to take digital x-rays.  Beguiristain asked Dolan and Piotrowski to get the chemical x-ray machine working.  According to Piotrowski, Beguiristain asked her and Dolan to dump hazardous chemicals down the sink drain, which Piotrowski refused to do.  According to Beguiristain, she asked Piotrowski to dump the chemicals into a bucket, not into the sink.  When Piotrowski refused, Beguiristain dumped the chemicals into the bucket herself.

Beguiristain's handwritten notes produced at trial indicate she had numerous issues with Piotrowski during the March and April timeframe, which included her gossiping with the "new

assistant;" her allegations of "insurance fraud;" her "undermining practice philosophy;" her instigation and insubordination; her violation of practice rules; and her discussion of private practice information.

From the record, it appears that on May 9, 2011, Beguiristain ran a provider productivity report for 2010, which showed that during that year Piotrowski saw 1,126 patients, whose average visit generated $156.49, resulting in production of $176,208.75. The amount collected for Piotrowski's hygiene work, however, was only $60,036.71. This amount was less than Piotrowski's $68,542.12 in earnings in 2010. The Debtor indicated that Piotrowski should have produced twice as much as she did in 2010. In his opinion, Piotrowski should have had only 5-7% in appointment openings. By the spring of 2011, she had 30%.

On May 10, 2011, Dolan purportedly hurt her arm at work. Piotrowski did not see the incident, but Beguiristain told her that Dolan had faked an injury. Piotrowski testified that she heard a lot of commotion coming from the Debtor's office after the incident; he seemed upset and stated that Dolan's resulting worker's compensation claim was going to ruin his business.

On May 11, 2011, Piotrowski went to work as usual. Dolan was not in the office but arrived later that day with her arm in a sling. Later that same day, Dolan informed Piotrowski that she had just been fired. Piotrowski was then called to a meeting with the Debtor and Beguiristain, at which they informed her that she was being terminated. Piotrowski contends that she was terminated for claiming that the Debtor and Beguiristain were committing insurance fraud. The Debtor and Beguiristain insist that she was terminated for other reasons. Piotrowski's written termination review recites five categories of reasons for her termination: (1) discussing private practice information with former employees; (2) insubordination and practice rule violation; (3) instigating conflict within the office and making derogatory comments about the Debtor and Beguiristain, along with false accusations; (4) negative attitude; and (5)

11

having more than 50% openings in hygiene (pay, far exceeded production).  Each category

(except the last) recited further details supporting the Debtor's rationale for terminating

Piotrowski's employment.  A copy of the written termination review was not given to Piotrowski

at the meeting but was contained in her personnel file.   A subcategory under "instigating

conflict" included "[s]aying 'horrific things' to Cathy about Beguiristain and Dr. Boulard as

Cathy stated on 4/26/11 including but not limited to ….. i. Insurance fraud.  ii. Falsifying

financial state of practice to avoid paying child support."

     Piotrowski indicated that Beguiristain and the Debtor told her at her termination meeting

that she was being terminated because she told someone outside of the office that the office was

committing insurance fraud, that patients had complained about her, that she failed to make

continuing care calls to patients, that she socialized with patients and former staff, and that she

was upset about not getting a raise.  The Debtor purportedly told the Plaintiff that "she did this to

herself."

     The Debtor testified that during Piotrowski's termination meeting the billing code issue

arose.  Purportedly, Piotrowski was shown the CDT Handbook that day (as she had been

previously) to explain his and Beguiristain's rationale for charging for a periodic oral evaluation

(CDT 0120).  The Debtor testified that Piotrowski got angry.  He told her that they were just

going to have to agree to disagree on the billing issue.  The Debtor testified that he would not

have terminated Piotrowski just for bringing up the insurance issue.

     The Debtor contends that Piotrowski was terminated because her job performance was

below acceptable standards and she failed and refused to improve her performance or even admit

that she had any performance problems.  According to the Debtor, Piotrowski did not meet

financial expectations, and her pay far exceeded her production.  She was not willing to make the

continuing care calls that would have resulted in reactivating patients.  If she had, she would not

have had 30% openings from January 2011, through the date of her termination.  In addition, she was failing to take x-rays for patients who were due for x-rays.

The Debtor also testified that he was starting to get patient complaints about Piotrowski, including that patients indicated that their teeth did feel like they got cleaned and that Piotrowski talked so much during the appointment that she skipped some of the patients' teeth.  Piotrowski presented contrary evidence, including the testimony of one patient whose husband liked Piotrowski's hygiene services so much that the family followed her when she moved to the Debtor's dental practice.  The Debtor further testified that Dolan had also reported to him that Piotrowski told her that the Debtor was intentionally trying to ruin his practice so that he would not have to pay child support.  The Debtor testified that this was tough to hear as he cared about his employees and his child.  He indicated that Piotrowski's negative attitude and failure to work as part of a team were affecting his practice.  He indicated that the tension in the office was high.

After Piotrowski was terminated, she sought unemployment benefits.  In connection with that request, the Debtor and Beguiristain indicated (in a filing with the New Hampshire Employment Security office made within days of Piotrowski's firing) that Piotrowski was terminated for "insubordination, practice rule violation, instigating conflict within the office, derogatory comments about office manager & Dr. Boulard, negative attitude, her production reduced by 50% in 2010."

On December 15, 2011, approximately seven months after she was terminated, Piotrowski filed a complaint with the New Hampshire Board of Dental Examiners, in which she outlined her concerns with the Debtor's dental practice.  As a result of Piotrowski's complaint, the Board conducted two inspections of the Debtor's dental practice on March 8, 2012, and April 30, 2012.  On May 21, 2012, the Debtor's license to conduct moderate sedation dentistry was

indefinitely suspended, which decision was affirmed in part by the New Hampshire Supreme Court on August 28, 2013.  Appeal of Boulard, 165 N.H. 300 (2013).

The Debtor testified that, due to the Board's decision to suspend his moderate sedation license, he was forced to sell his dental practice as his sedation services had generated almost one-third of his production.  Accordingly, on September 14, 2012, the Debtor sold his dental practice.  Thereafter, he began working at a dental practice in Hillsboro, New Hampshire.

The Debtor filed a chapter 13 bankruptcy petition with this Court on January 17, 2013.  On May 30, 2013, while his bankruptcy case was pending, Piotrowski filed a whistleblower's complaint pursuant to RSA 275-E with the New Hampshire Department of Labor.  In her complaint, Piotrowski stated:  "I was fired for reporting to my employer that his office manager was billing for services that were not performed, and that she was requiring staff to perform procedures outside of their licensure."  The action was stayed due to the Debtor's bankruptcy filing.  The Debtor voluntarily converted his case to chapter 7 on August 14, 2013, and on November 15, 2013, Piotrowski filed this adversary proceeding.

On or about September 22, 2014, Piotrowski filed a claim with the Boston office of the National Labor Relations Board (the "NLRB") against the Debtor, alleging that the Debtor had engaged in unfair labor practices while operating his dental practice.  Shortly thereafter, the Debtor filed a complaint with this Court contending that Piotrowski had violated the automatic stay by filing such a suit while his bankruptcy case was pending.  The Court dismissed the Debtor's adversary proceeding on March 4, 2015.  It was suggested at the hearing on the Debtor's motion to dismiss that the NLRB charge had either been withdrawn or dismissed.

On April 8, 2015, shortly before trial of this adversary proceeding, the New Hampshire Board of Dental Examiner's dismissed Piotrowski's December 2011 complaint, which had raised Piotrowski's billing concerns.  The Board noted it was "concerned with the allegations regarding

Cathy Dolan practicing beyond scope and with billing issues."  However, the Board concluded

that "the alleged conduct in itself does not justify action at this time."  Prior to its dismissal, the

Dental Board, through the New Hampshire Attorney General's Office, had advised the New

Hampshire Insurance Department's fraud unit, in a letter dated December 11, 2014, that it had

information that the Insurance Department may want to review concerning allegations of

insurance fraud against the Debtor.


## III.  DISCUSSION

Plaintiff claims she was terminated for engaging in legally protected activity, i.e.,

reporting (or causing her co-worker to report) to the Defendant the Plaintiff's concerns that

Beguiristain, the Defendant's office manager, was committing fraud by billing patients for

services that were not performed and/or submitting false data to insurance companies for the

purpose of obtaining insurance coverage.  In her complaint, she seeks:

A.  A determination that the Defendant is liable to her for (1) the claims she asserted in her whistleblower's complaint; and (2) any claim she may bring in state court for wrongful discharge;
B.  A determination as to the amount of said debts;
C.  A determination that such debts are excepted from discharge pursuant to 11 U.S.C. § 523(a)(6);
D.  An award of the costs of this litigation, including reasonable attorney's fees; and
E.  That the costs of the Clerk of Court be taxed against the Defendant.

### A.  Statutory Construction and Burden of Proof in Non-Dischargeability Actions

Exceptions to discharge are to be narrowly construed in favor of the debtor.  See Sharfarz

v. Goguen (In re Goguen), 691 F.3d 62, 68 (1st Cir. 2012); Razzaboni v. Schifano (In re

Schifano), 378 F.3d 60, 66 (1st Cir. 2004); Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir.

1997); Gray v. Tacason (In re Tacason), 2014 BNH 017, 6.  Creditors seeking to except a debt

from discharge must show that their "claim comes squarely within an exception enumerated in

Bankruptcy Code § 523(a)." Palmacci, 121 F.3d at 786; see also Goguen, 691 F.3d at 68. The

burden of proving each element of a claim under § 523(a) rests with the party contesting the

dischargeability of the debt, i.e., normally the creditor. See Grogan v. Garner, 498 U.S. 279, 283

(1991); Palmacci, 121 F.3d at 787; Tacason, 2014 BNH 017, 6. The standard of proving each

element is by a preponderance of the evidence. See Grogan, 498 U.S. at 291; Tacason, 2014

BNH 017, 6.

### B. Excepting Debts from Discharge under 11 U.S.C. § 523(a)(6)

The Bankruptcy Code specifically excepts from discharge "any debt . . . for willful and

malicious injury by a debtor to another entity or the property of another entity." 11 U.S.C. §

523(a)(6) (emphasis added). To prevail on a § 523(a)(6) cause of action, the creditor must prove

all of the following elements:

1. the creditor suffered an injury;
2. the injury was the result of the debtor's actions;
3. the debtor intended to cause the injury or that there was a substantial certainty that the injury would occur; and
4. the debtor had no just cause or excuse for the action resulting in injury.

B.B. v. Bradley (In re Bradley), 466 B.R. 582, 587 (B.A.P. 1st Cir. 2012) (quoting Hermosilla v.

Hermosilla (In re Hermosilla), 430 B.R. 13, 22 (Bankr. D. Mass. 2010)); see Kawaauhau v.

Geiger, 523 U.S. 57, 62 (1998). The first element enumerated above—the "injury"—requires the

Plaintiff to prove the existence of a debt, i.e., that the Debtor is liable to her on a claim.[13] There

has not been any adjudication that the Defendant owes the Plaintiff a debt, as the state law

whistleblower proceeding was stayed by the Debtor's bankruptcy petition. Accordingly, the

Plaintiff must first establish that she in fact holds a debt against the Debtor, and then that the debt

may be excepted from discharge.

---

[13] Section 101(12) of the Bankruptcy Code defines "debt" as meaning "liability on a claim." 11 U.S.C. § 101(12).

Plaintiff contends that the Debtor is liable to her for her wrongful discharge as outlined in her whistleblower's complaint.  She asserts that the Defendant has violated New Hampshire's whistleblower statute.  Specifically, she contends that the Defendant failed to comply with RSA 275-E:2(I)(a), which provides:

> No employer shall harass, abuse, intimidate, discharge, threaten, or otherwise discriminate against any employee regarding compensation, terms, conditions, location, or privileges of employment because . . . [t]he employee, in good faith, reports or causes to be reported, verbally or in writing, what the employee has reasonable cause to believe is a violation of any law or rule adopted under the laws of this state, a political subdivision of this state, or the United States.

(emphasis added).  Thus, Piotrowski seeks to prove that she reported conduct to the Debtor that she reasonably believed was unlawful, i.e., that the Debtor's coding and billing practices constituted insurance fraud and violated RSA 317-A.[14][15]  Under New Hampshire's whistleblower statute, aggrieved employees may bring a civil suit within three years of the alleged violation of the statute, and the court may order reinstatement and back-pay, as well as reasonable attorney's fees and costs, to the prevailing party.  RSA 275-E:2(II).

---

[14]  Piotrowski has not clearly articulated what state law or rule the Defendant has purportedly violated.  In her post-trial memorandum she makes reference to RSA 317-A (which governs dentists and dentistry) without specifically citing which particular section of this chapter applies.  It appears that she may believe RSA 317-A:17(j) applies, which identifies as professional misconduct (sufficient to warrant adverse action by the Dental Board) knowing and willful violation of any "federal, state, or local laws or regulations pertaining  to . . . the practice of dentistry, and the Principles of Ethics and Code of Professional Conduct of the American Dental Association."  The ethical rules appear to prohibit purposefully improper billing.  Piotrowski also makes reference in her post-trial memorandum to RSA 638:30, which provides that a person is guilty of "insurance fraud" if a person "knowingly and with intent to injure, defraud or deceive any insurer . . . presents or causes to be presented to any insurer . . . any written or oral statement . . . knowing such statement contains any false, incomplete or misleading information which is material to . . . [a] claim for payment or benefit pursuant to any insurance policy."

[15]  The Court will assume, without deciding, that Piotrowski had reasonable cause to believe that the Defendant was violating state law when he permitted or authorized Beguiristain to submit claims to insurance companies for procedures which were not actually performed, e.g., the prophylaxis of the unscheduled patient or the periodontal charting on September 28, 2010, or which were purportedly billed improperly, e.g., charging for an oral evaluation when the Debtor had not physically examined a patient.  For purposes of this decision, the Court need not determine whether the Debtor was actually engaging in fraudulent billing practices in violation of state law, which matter apparently has been referred to the NH Insurance Department's fraud unit.  The Court notes that the Debtor denies that he improperly used CDT 0120 or otherwise committed insurance fraud.  Together the Debtor and Beguiristain testified that any billing improprieties were the result of differing interpretations of billing codes and/or simple mistakes.  The Debtor testified that he never had "an intent to deceive," which appears to be an element of fraudulent billing and/or insurance fraud.

In resolving claims under RSA 275-E, employees can prove that their employer retaliated against them in two ways:  the "pretext approach" and the "mixed motive" approach.  See In re Hardy, 154 N.H. 805, 812 (2007).  The New Hampshire Supreme Court has detailed "the characteristics of, and the burdens under, the two approaches" as follows:

> The quality of the evidence determines whether a ''pretext'' or a ''mixed motive'' analysis applies.  If there is only circumstantial evidence of retaliation, then the ''pretext'' approach applies.  If there is direct evidence of retaliation, then the ''mixed motive'' approach applies.  An employee may proceed simultaneously on both approaches.  Based upon the availability or unavailability of the proffered evidence, the hearing officer or trial court channels the case into one approach or the other.

> . . . Under the ''pretext'' . . . scheme, the employee bears the initial burden of establishing a prima facie case of unlawful conduct.  To establish a prima facie case of retaliation, the employee must demonstrate that: (1) [he] engaged in an act protected by [RSA chapter 275–E]; (2) [he] suffered an employment action proscribed by [RSA chapter 275–E]; and (3) there was a causal connection between the protected act and the proscribed employment action.

> Establishing a prima facie case of retaliation creates a presumption that the employer unlawfully retaliated against the employee.  This presumption places a burden upon the employer to rebut the prima facie case—i.e., the burden to produce evidence that the adverse employment action was taken for legitimate, non-retaliatory reasons.  The burden placed upon the employer is only a burden of production; the employee retains the burden of persuasion.

> If the employer satisfies its burden of production, the presumption raised by the prima facie case is rebutted and drops from the case.  The employee then has the opportunity to show that the employer's proferred [sic] reason was not the true reason for the adverse employment action and that retaliation was.  The employee may do this either indirectly by showing that the employer's stated reasons were not credible, or directly by showing that the adverse employment action was more likely motivated by retaliation.  Under the ''pretext'' approach, the employee retains the ultimate burden of persuading the trier of fact that he or she was the victim of unlawful retaliation.

> If the employee produces direct evidence that retaliation played a substantial role in a particular employment decision, then the ''mixed motive'' approach applies.  If the trier of fact believes the employee's direct evidence, the burden of persuasion shifts to the employer to show that despite the retaliatory animus, it would have made the same adverse employment decision for legitimate, non-retaliatory reasons.  Evidence is considered to be direct if it consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on

the contested employment decision.  Thus, so long as the employee can meet the evidentiary burden required by the ''mixed motive'' approach, then the burden of persuasion remains with the employer.

Id. at 812-13 (quoting Appeal of Montplaisir, 147 N.H. 297, 300-02 (2001) (quotations and citations omitted)).

Piotrowski contends that the "mixed motive" approach applies in this case.  The Court agrees.  The record contains direct evidence that the Debtor and Beguiristain terminated Piotrowski, in part, because she reported her concerns about improper billing and insurance fraud to both Beguiristain and the Debtor and caused Dolan to report the same.  The decision to terminate Piotrowski came within days of Dolan's meeting with Beguiristain, during which Dolan relayed to Beguiristain that Piotrowski had informed her that the practice was charging for work that was not done and was committing insurance fraud.  In addition, Piotrowski's termination review specifically mentions "insurance fraud."  Lastly, at trial, the Debtor testified that he would not have terminated Piotrowski just for raising the insurance issue, i.e., "not solely that reason," which demonstrates that the insurance issue was part of the reason for Piotrowski's termination.  Thus, Piotrowski has satisfied her burden of establishing that retaliation played a substantial role in the Debtor's decision to terminate her.

Under the "mixed motive" approach, the burden of persuasion shifts to the Defendant to show that "despite the retaliatory animus, [he] would have made the same adverse employment decision for legitimate, non-retaliatory reasons."  Montplaisir, 147 N.H. at 301.  Upon review of the record, the Court believes that the Debtor would have terminated Piotrowski for "legitimate, non-retaliatory reasons."

Piotrowski began her employment with the Debtor in February 2009.  The record reveals no problems between Piotrowski and Beguiristain and the Debtor prior to October 2010.  So for a period of more than eighteen months, the employment relationship was satisfactory to the

19

parties.  In early October, Piotrowski became upset over the re-billing issue concerning the periodontal charting of a patient (which Piotrowski contends was not done and Beguiristain and the Debtor contend was done).  She was concerned about Beguiristain's purported statement that she had just committed insurance fraud and Beguiristain's subsequent threat to Piotrowski. Although she was upset, Piotrowski did not report her concerns to the Debtor at that time.

In December 2010, Piotrowski purportedly asked for a raise, which request the Debtor denied, having explained to Piotrowski that he could not afford to increase her pay given her production rate.  The Debtor testified that after Piotrowski's request was denied, her attitude changed and became negative.

Shortly thereafter, in February 2011, Dolan started working for the Debtor.  Problems appeared to escalate after her arrival.  From the record, it appears that Dolan and Piotrowski began to have conversations about the practice.  They began to gossip and Piotrowski began to raise issues with Beguiristain and the Debtor.  Within days of Dolan's arrival, there was an incident regarding whether Piotrowski could administer local anesthesia.  Beguiristain takes the position that Piotrowski was insubordinate and refused to confirm whether or not Piotrowski could administer anesthesia if the Debtor were not present in the office.

Within another few weeks, there was the incident with the unscheduled patient and the proper billing for her appointment.  Within a couple of days of that incident, the Debtor and Beguiristain were out and Dolan and Piotrowski took several phone calls from patients who had concerns with their bills.  After these incidents, Dolan and Piotrowski raised their issues with the Debtor directly, who informed them that Beguiristain was the office manager and knew what she was doing with regard to the billing issues.  However, Dolan and Piotrowski were not satisfied with his response.  Dolan testified that she did not respect Beguiristain as a manager.

By the middle of April, it was clear that the Debtor and Beguiristain were not satisfied with Dolan's performance. Beguiristain scheduled a meeting with her to go over areas in which her performance needed to improve. At this meeting, Dolan reported to Beguiristain "horrific things" that Piotrowski was saying about Beguiristain and the Debtor, including that Beguiristain was stealing money from the practice to give to her ex-husband and that the Debtor was intentionally running his business into the ground to avoid paying child support. Based on these reported statements, it is not surprising that Beguiristain and the Debtor felt that Piotrowski was not maintaining a "team atmosphere" nor contributing to the "spirit of cooperation and helpfulness" as required by the employee handbook and policy manual.

Although the evidence on this was conflicting, it appears that Piotrowski may have relayed confidential practice information to a former employee about the termination of Dr. Liberatore, contrary to the confidentiality agreement she signed upon accepting employment with the Debtor. If true, this further bolsters the Debtor's position that that he terminated Piotrowski for legitimate, non-retaliatory reasons.

Lastly, and perhaps most significantly, the collections for the Debtor's services were not enough to cover Piotrowski's $68,000.00 salary as evidenced by the production report dated a few days before Piotrowski was terminated. Piotrowski worked approximately 190 days per year. With a production goal of $2,000.00 per day, she should have been producing $380,000.00 per year, and yet the production report shows she produced only $176,208.75, or less than half of the goal in 2010. The Debtor testified that Piotrowski could have increased her production by making more continuing care calls and taking more x-rays. Piotrowski testified, however, that she did not like calling patients at work and that she did not always take x-rays due to patients' concerns about radiation and cost.

21

Given these numbers, keeping Piotrowski on staff at her high rate of pay did not make financial sense even if the Debtor thought she was a valuable employee in all other regards. However, starting in 2011, Piotrowski's attitude changed and, once Dolan started working at the office, Piotrowski started gossiping and instigating conflict. Given the small office size, it is not surprising that Beguiristain and the Debtor preferred employees that respected each other and Beguiristain's and the Debtor's opinions and roles as manager and employer. Because the tension in the office was high, it made sense that Beguiristain and the Debtor began looking to hire a new dental assistant and dental hygienist who would work cooperatively together. Thus, even though Piotrowski's complaints that the Debtor and Beguiristain were committing insurance fraud motivated their decision, in part, to terminate Piotrowski, the Court finds that the Debtor would have made the same decision for the legitimate, non-retaliatory reasons outlined above.

Accordingly, the Court finds that Piotrowski was not wrongfully discharged in violation of New Hampshire's whistleblower statute. As an at will employee, the Debtor was free to terminate Piotrowski for cause or no cause at all as outlined in the employee handbook and policy manual. For that reason, Piotrowski does not have a valid claim for back-pay or attorney's fees and costs. Because Piotrowski has not established the preliminary element under § 523(a)(6), i.e., that she is owed a debt by the Debtor, there is no debt to except from discharge. Therefore, the Court must deny the relief sought in the Plaintiff's complaint.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that the Plaintiff has not carried her burden of proof with respect to her claim under § 523(a)(6). Judgment on the Plaintiff's complaint shall enter in favor of the Debtor. This opinion constitutes the Court's findings of fact

and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The

Court will issue a separate judgment consistent with this opinion.

       ENTERED at Manchester, New Hampshire.


Date:   July 20, 2015            /s/ Bruce A. Harwood
                                      Bruce A. Harwood
                                      Chief Bankruptcy Judge